**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| FIRST-CLASS MONITORING, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:19-CV-00106-WCB |
| | § | |
| UNITED PARCEL SERVICE OF | § | |
| AMERICA, INC., | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

This is a patent infringement action brought by plaintiff First-Class Monitoring, LLC ("FCM") against defendant United Parcel Service of America, Inc. ("UPS"). Before the Court is UPS's motion to dismiss the complaint based on patent ineligibility under 35 U.S.C. § 101. Dkt. No. 19. Following briefing and oral argument before the Court on July 10, 2019, the Court GRANTS the motion.

## BACKGROUND

Plaintiff FCM is the assignee and owner of U.S. Patent No. 6,014,089 ("the '089 patent"), which is entitled "Method for Transmitting Data Using a Digital Control Channel of a Wireless Network," and which is directed to methods for transmitting data, such as utility meter readings, to a remote device using a personal communications system. Dkt. No. 1, at 2. The '089 patent issued from U.S. Application No. 08/920,085. '089 patent, Cover Sheet. That application was a continuation-in-part of U.S. Application No. 08/740,361, now U.S. Patent No. 6,150,955 ("the '955 patent"). The '955 patent is directed to a meter reader (such as a utility meter reader) and apparatus and methods for wirelessly transmitting the meter readings to a remote device. '955

patent, Cover Sheet. On March 28, 2019, FCM filed a complaint against UPS, alleging infringement of at least claim 8 of the '089 patent. Dkt. No. 1, at 3. Subsequently, FCM served its preliminary infringement contentions, asserting claims 6 and 8 of the '089 patent. Dkt. No. 23, at 1.

## I. The '089 Patent

The '089 patent relates to "an apparatus and associated method for transmitting, receiving, storing, processing and digitally re-transmitting . . . information" from a data collection device to a remote receiving device via any personal communication system that employs a digital control channel. '089 patent, col. 1, ll. 12–22. The specification of the '089 patent discusses two general embodiments of the invention. The first embodiment "describes the use of the digital control channel to transmit data from one device to another using a drop and add packet technique." The second embodiment describes "the use of the short message portion of the personal communications system transmission protocol to transmit data from one device to another." *Id.*, col. 11, ll. 31–36.

### 1. First Embodiment: the Drop and Add Packet Technique

The specification explains that under existing wireless network technologies, such as Global Standards for Mobile Communications (GSM), Time Division Multiple Access (TDMA) Technology, Code Division Multiple Access (CDMA), Frequency Division Multiple Access (FDMA), and Personal Access Communications System (PACS), "there are 8 logical channels per radio frequency channel which are available for communication" between devices. *Id.*, col. 6, ll. 44–46; *see id.*, col. 1, ll. 17–22. Of the 8 logical channels, "7 channels are used for voice/data transmission and 1 channel is used as a control channel." *Id.*, col. 6, ll. 46–48. According to the

specification, the control channel "is normally used by the GSM, PACS, PDMA, CDMA or TDMA network to verify the caller's identification and billing information." *Id.*, col. 6, ll. 48–50. Given those limited functions, there are periods of time when the control channel is not is use. During periods when the control channel is not being used for those purposes, it "is capable of transmitting data over the network system without interfering with other control channel transmission." *Id.*, col. 6, ll. 54–59.

Data transmission during periods of non-use is accomplished using the "drop and add packet" technique. That technique repurposes the mechanism by which data is transmitted over the control channel. The '089 specification explains that because the control channel is generally underutilized, many of the transmission packets sent over the control channel contain no wireless network transmission information. Those packets are known as "dummy packets." The invention described in the first embodiment entails removing dummy packets that contain no transmission information and replacing them with "diverted transmission" packets. The diverted transmission packets contain data and instructions that can be used to enable the remote device to control individual data collection devices. In addition, the diverted transmission packets can contain data that the data collection devices collect and then transmit back to the remote device. *Id.*, col. 5, ll. 53–61; col. 6, ll. 29–36.

## 2. Second Embodiment: the Short Message Portion of the Personal Communication System Transmission Protocol

Beginning with column 11, the '089 specification describes an alternative embodiment for transmitting, receiving, storing, processing, and digitally re-transmitting information directly to a remote receiving device. That embodiment "employs the use of the short message portion of a personal communications system transmission protocol." *Id.*, col. 11, ll. 34–35. The short

message service uses a portion of the control channel of a personal communications system "to send a protocol specific number of characters of data to and from a mobile subscriber (MS)." *Id.*, col. 11, ll. 59–60.

In that embodiment, when a request for data is made, a remote device "encodes the request in the short message service portion of the control channel." *Id.*, col. 12, ll. 12–14. That data is "assembled into the control channel data sequence using various known techniques." *Id.*, col. 12, ll. 15–17. The specification discusses one assembly technique in detail, but emphasizes that "other techniques of assembling the control channel may be used." *Id.*, col. 12, ll. 43–44.

### 3. The Asserted Claims

The asserted claims of the '089 patent recite methods for transmitting a data sequence via the short message portion of a control channel. *See id.*, claims 1, 6–8. Claim 1, from which asserted claim 6 depends, recites the following:

> 1. A method for transmitting a data sequence via a personal communications system transmission protocol comprising the steps of:
>> composing at least one data packet including a request for data said at least one data packet including said request for data being in a form which conforms to conventional short message data packets;
>> transmitting said at least one data packet including said request for data from an access point to a data collection unit via a short message service portion of a control channel of the personal communications system transmission protocol as one or more short messages, wherein said step of transmitting said at least one data packet including said request for data includes the step of inserting said at least one data packet including said request for data into the control channel;
>> receiving said at least one data packet including said request for data at said data collection unit;
>> interpreting said request or data from said access point by said data collection unit;
>> compiling data from said data collection unit, said compiled data being requested in said request for data;
>> composing at least one data packet including, said compiled data, said at least one data packet including compiled data being in a form which conforms conventional short message data packets;

transmitting said at least one data packet including said compiled data from said data collection unit to said access point via said short message service portion of the control channel of the personal communications system transmission protocol as one or more short messages, wherein said step of transmitting said at least one data packet including said compiled data includes the step of inserting said at least one data packet including said compiled data into the control channel; and
receiving said at least one data packet including said compiled data at said access point.

Claim 6 adds the steps of "collecting data at said data collection unit; electronically stamping said collected data with a date and time . . . ; and storing said processed and electronically stamped data."

Claim 7, from which asserted claim 8 depends, differs from claim 1 in that it recites the automatic collection of data at the data collection unit, compared with data collection initiated by a data request. Claim 7 states the following:

7. A method for transmitting a data sequence via a personal communications system transmission protocol comprising the steps of:
automatically collecting data at a data collection unit;
composing at least one data packet including said collected data, said at least one data packet including said collected data being in a form which conforms to conventional short message data packets;
inserting said at least one data packet including said collected data in a short message service portion of a control channel of the personal communications system transmission protocol as one or more short messages; and
transmitting said at least one data packet including said collected data to an access point via said short message service portion of the control channel of the personal communications system transmission protocol as one or more short messages.

Claim 8, which is generally similar to claim 6, adds the step of "stamping [the] collected data with a date and time that said data was collected by said collecting step."

## II. UPS's Motion to Dismiss

UPS filed a motion under Fed. R. Civ. P. 12(b)(6) to dismiss FCM's complaint. Dkt. No. 19. In that motion, UPS argues that the asserted claims of the '089 patent are patent-ineligible

under 35 U.S.C. § 101. The claimed method of "requesting, collecting, and transmitting data using generic computers and conventional SMS protocols," according to UPS, is directed to abstract ideas, and "[r]eciting those abstract ideas using well-known, conventional, off-the-shelf devices and transmission protocols" does not transform the abstract ideas into patent-eligible subject matter. Dkt. No. 19, at 1. UPS further asserts that adding the limitation directed to stamping the data with a time and date, as provided for in dependent claims 6 and 8, does not render the claims patent-eligible. *Id.*

## DISCUSSION

### I. The Alice Two-Step Test

The framework for analyzing the issue of patentable subject matter under 35 U.S.C. § 101 is well settled. The Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014), established a two-step test for determining whether a patent is directed to an unpatentable idea. First, the court must determine "whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. 573 U.S. at 218. Second, if the claims are directed to an abstract idea, the court must decide whether there is an "inventive concept" in the claims at issue. The Supreme Court characterized an "inventive concept" as "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself'"; the presence of an "inventive concept," the Court explained, is enough to "'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.* 566 U.S. 66, 72–73, 78 (2012)).

The first step of the two-step *Alice* analysis requires the court to examine the "focus" of the claim, i.e., its "character as a whole," in order to determine whether the claim is directed to an abstract idea. *Trading Techs Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). The second step, if reached, requires the court to "look[] more precisely at what the claim elements add—specifically, whether, in the Supreme Court's terms, the claims identify an "'inventive concept' in the application of the ineligible matter to which (by assumption at step two) the claim is directed." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations omitted).

### 1. Step 1: Abstract Idea

Defining an "abstract idea," as that term is used in section 101 jurisprudence, has not proved to be a simple task. Neither the Supreme Court nor the Federal Circuit has ventured a single, comprehensive definition. *See Alice*, 573 U.S. at 221 ("[W]e need not labor to delimit the precise contours of the 'abstract ideas' category in this case."); *Bilski v. Kappos*, 561 U.S. 593, 621 (2010) (Stevens, J., concurring in the judgment) ("The Court . . . never provides a satisfying account of what constitutes an abstract idea."); *Elec. Power Grp.,* 830 F.3d at 1353 ("We need not define the outer limits of 'abstract idea'"); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) ("The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry. . . . Rather, both this court and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases."). Rather than a unitary test, what has emerged from the section 101 cases is a group of related principles that can

be applied in gauging whether or not a patent claim is directed to an abstract idea. They include the following:

First, the courts have characterized "method[s] of organizing human activity" as abstract. *See Alice*, 573 U.S. at 220; *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018). In particular, the courts have identified fundamental economic practices that have long been prevalent in our system of commerce as abstract ideas. Applying that principle in the field of computers and telecommunications, the courts have held that claims directed to simply implementing such economic practices on a computer are not patent-eligible. *See Alice*, 573 U.S. at 217–21; *Bilski*, 561 U.S. at 611; *BSG*, 899 F.3d at 1285 ("If a claimed invention only performs an abstract idea on a generic computer, the invention is directed to an abstract idea at step one" of *Alice.*). Nor does the fact that a computer can perform such operations more rapidly and efficiently make an abstract idea any less abstract or any more patent-eligible. *See, e.g., RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis.").

Second, with regard to computer applications, the courts have looked to whether the claim in question is directed to an improvement in computer technology as opposed to simply providing for the use of a computer to perform "economic or other tasks for which a computer is used in its ordinary capacity." *Enfish,* 822 F.3d at 1336. Where the claims at issue provide for an

improvement in the operation of a computer, such as a new memory system, a new type of virus scan, or a new type of interface that makes a computer function more accessible, the Federal Circuit has found the claims patent-eligible. *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018) (methods for making electronic spreadsheets more accessible); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361–63 (Fed. Cir. 2018) (improved display devices); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018) (novel method of virus scanning); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017) (improved computer memory system).

Numerous Federal Circuit decisions have drawn a distinction between patent-eligible claims that "are directed to a specific improvement in the capabilities of computing devices," as opposed to "'a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Core Wireless*, 880 F.3d at 1361–62 (quoting *Enfish*, 822 F.3d at 1336); *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014). In the computer field, this principle has sometimes been described as requiring "a technological solution to a technological problem specific to computer networks." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("the claims are not directed to a solution to a 'technological problem'").

Third, in determining whether claims of a patent are directed to an abstract idea, we "look[] at the 'focus' of the claims." *Elec. Power Grp.*, 830 F.3d at 1353 (quoting *Enfish*, 822 F.3d at 1335–36.). It is "not enough to merely identify a patent-ineligible concept underlying the claim;

we must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (quoting *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016)). In doing so, the court must "consider the claims 'in their entirety to ascertain whether their character as a whole is directed to excluded subject matter.'" *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019) (quoting *Internet Patents Corp.,* 790 F.3d at 1346).

Fourth, the Supreme Court has identified the risk of preemption as an important consideration in the analysis of patent eligibility. *See Alice*, 573 U.S. at 216 ("We have described the concern that drives this exclusionary principle [the unpatentability of, inter alia, abstract ideas] as one of pre-emption."); *Bilski v. Kappos*, 561 U.S. 593, 611–12 (2010) (upholding the patent "would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea"); *ChargePoint*, 920 F.3d at 766 ("[T]he concern that drives the judicial exceptions to patentability is one of preemption.") (citations and quotations omitted)); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015) ("The Supreme Court has made clear that the principle of preemption is the basis for the judicial exceptions to patentability."). Where the risk of broad preemption is great, concern over patenting abstract ideas is at its apogee.

Fifth, in determining whether a particular claim is directed to an abstract idea, courts have focused on whether the claim is purely functional in nature rather than reciting how the claimed function is achieved. The Federal Circuit has identified functional claiming as an indicator of abstractness in a number of recent section 101 decisions. In those cases, the Federal Circuit, treating the term "abstract" as an antonym of "concrete" or "specific," has analyzed whether the claims before it are sufficiently concrete or specific to be directed to a patent-eligible process rather

than a patent-ineligible result.  For example, in *SAP America*, 898 F.3d at 1167, the court asked whether the claim had "the specificity required to transform [it] from one claiming only a result to one claiming a way of achieving it."  To answer that question, the Federal Circuit has directed courts to "look to whether the claims focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery."  *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *McRO*, 837 F.3d at 1314 ("We therefore look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery.").  Thus, the question in such cases is "whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result."  *RecogniCorp*, 855 F.3d at 1326.

Applying that analysis, the Federal Circuit in *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335 (Fed. Cir. 2018), held a claim to an "attention manager" in a computer readable medium to be patent-ineligible.  That was so, the court explained, because the claim recited a "broad, result-oriented" structure, and because "[i]nstead of claiming a solution for producing [a] result, the claim in effect encompasses all solutions."  896 F.3d at 1345.  After reviewing decisions going back to the early nineteenth century holding that "a claim for an art or principle in the abstract" is unpatentable, the court observed that "a claimed invention must employ a concrete solution to a problem having 'the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it.'"  *Id.* at 1342–43 (quoting *Wyeth v. Stone*, 30 F. Cas. 723 (C.C.D. Mass. 1840), and *SAP Am.*, 890 F.3d at 1021–22).

Other cases from the Federal Circuit have employed the same analysis and applied it to hold claims ineligible under section 101. *See Clarilogic, Inc. v. Formfree Holdings Corp.*, 681 F. App'x 950, 954 (Fed. Cir. 2017) ("[A] method for collection, analysis, and generation of information reports, where the claims are not limited to how the collected information is analyzed or reformed, is the height of abstraction."); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) ("IV argues that the claims set forth a unique solution to a problem with contemporary XML documents. . . . But the claims do not recite particular features to yield these advantages. Although the claims purport to modify the underlying XML document in response to modifications made in the dynamic document, this merely reiterates the patent's stated goal itself. . . . Indeed, the claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it. Our law demands more."); *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1330 (Fed. Cir. 2017) (claimed "mobile interface" for remotely accessing and retrieving user-specified information is an abstract idea where the claimed invention "does not recite any particular unique delivery of information through this mobile interface . . . [but] merely recites retrieving the information through the mobile interface"); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) ("The patents claim systems including menus with particular features. They do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems."); *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) ("While independent claim 1 refers to general components such as a cellular telephone, a graphical user interface, and a downloadable application, the claimed invention is entirely functional in nature. It recites software in the form of 'an application configured for

execution by the wireless cellular telephone device' that performs three functions . . . . There is nothing in claim 1 that is directed to *how* to implement out-of-region broadcasting on a cellular telephone. Rather, the claim is drawn to the idea itself."); *McRO,* 837 F.3d at 1314 ("The abstract idea exception has been applied to prevent patenting of claims that abstractly cover results where 'it matters not by what process or machinery the result is accomplished.'"); *Elec. Power Grp.*, 830 F.3d at 1356 (referring to the "important common-sense distinction between ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them" and quoting with approval the district court's observation that "there is a critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general."); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 615 ("vague, functional descriptions of server components are insufficient to transform the abstract idea into a patent-eligible invention"); *Internet Patents*, 790 F.3d at 1348 ("[C]laim 1 contains no restriction on how the result is accomplished. The mechanism for maintaining the state is not described, although this is stated to be the essential innovation.").

### 2. Step Two: Inventive Concept

The "inventive concept" step requires the court to determine whether the claims recite an element or combination of elements that is sufficient to ensure that the patent claims "significantly more" than the ineligible abstract idea itself. *Alice*, 573 U.S. at 218; *Mayo*, 566 U.S. at 72–73. As the Supreme Court explained in *Alice*, the court at the second step of the inquiry looks to see whether there are any "additional features" that constitute an inventive concept that would render the claims eligible for patenting even if they were determined to be directed to an abstract idea. *Alice*, 573 U.S. at 221; *see also Erie Indemnity Co.*, 850 F.3d at 1328. The *Alice* Court explained

that no such "inventive concept" would be found if the "additional features" were merely "well-understood, routine, conventional activities." *Alice*, 573 U.S. at 225 (quoting *Mayo*, 566 U.S. at 73).

Step two of the *Alice* test "'looks more precisely at what the claim elements add' to determine if 'they identify an inventive concept in the application of the ineligible matter to which . . . the claim is directed.'. . . The abstract idea itself cannot supply the inventive concept, 'no matter how groundbreaking the advance.'" *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1385 (Fed. Cir. 2019) (quoting *SAP America*, 898 F.3d at 1167). In short, the court must determine whether the claims "improve[] an existing technological process." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 223).

## II. Applying Those Principles to This Case

### 1. Step One: Whether the asserted claims of the '089 patent are directed to an abstract idea

UPS argues that claims 1 and 7, from which asserted claims 6 and 8 depend, "fail step one of the *Alice* inquiry because they are directed to the abstract idea of requesting, collecting, analyzing, and transmitting information." Dkt. No. 19, at 10. Dependent claims 6 and 8, UPS asserts, simply add a time and date stamp, "which does not render the idea any less abstract." *Id.*

In response, FCM argues that the asserted claims of the '089 patent "describe an approach to accomplishing a specific, practical, and useful improvement to the existing processes used for monitoring utility usage and other information that increases the efficiency of the system and reduces traffic on the SMS [(Short Message Service)] control channel." Dkt. No. 23, at 12.

Contrary to FCM's argument, the claims are not based on an improvement in computer or communications technology. The specification makes clear that the technology on which the

claims rely is conventional and well known. The claims are not directed to a technological solution to a technological problem, but merely look to the use of known technology to communicate information of a type that, according to FCM, has not previously been transmitted using that technology. Thus, the claims are directed to "a result or effect that . . . merely invoke[s] generic processes and machinery." *Enfish*, 837 F.3d at 1314. For example, claim 1 recites the steps of composing, receiving, and compiling data packets in a form that "conforms to conventional short message data packets," and transmitting those packets "via a short message service portion of a control channel of the personal communications system transmission protocol." '089 patent, claim 1. The specification explains that the "personal communications system transmission protocol" is a generic system. According to the specification, it "includes several standard wireless transmission systems." *Id.*, col. 3, line 66, through col. 4, line 1. Examples of those standard systems are GSM, TDMA, CDMA, FDMA, PACS, and "any wire or wireless transmission system that employs a digital or analog transmission protocol system." *Id.*, col. 4, ll. 1–9. Additionally, the specification explains that the assembly and disassembly of data into the short message service portion of the protocol's control channel is a known, standard process: "assembly [and] disassembly of the request of data and the transmission packets in the control channel data sequence may be made using standard data packet assembly and disassembly techniques for standard short message service protocol technology." '089 patent, col. 13, ll. 7–11; *see id.*, col. 12, ll. 15–17 ("The data may be assembled into the control channel data sequence using various known techniques.").

The process of requesting, collecting, analyzing, and transmitting information, without more, is directed to an abstract idea. *See Elec. Power Grp.*, 830 F.3d at 1354 ("[A] process of

gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions . . . [is] directed to an abstract idea."). The act of attaching classification data, such as date and time stamps, to such information is likewise directed to an abstract idea. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 613 ("Here, we find that, like the claims at issue in *Content Extraction* which were directed to 'collecting data,' 'recognizing certain data within the collected data set,' and 'storing the recognized data in memory,' . . . attaching classification data, such as dates and times . . . is a well-established 'basic concept' sufficient to fall under *Alice* step 1."). Performing those steps by using the conventional functionality of a communications system, which includes "any wire or wireless transmission system that employs a digital or analog transmission protocol system," '089 patent, col. 4, ll. 7–9, does not make the process any less abstract. *See Two-Way Media*, 874 F.3d at 1338 ("Though Two-Way Media argues that its proposed claim constructions sufficiently tie the claims to particular scalable network architecture, the constructions recite only conventional computer components."); *Enfish*, 822 F.3d at 1338 ("And unlike the claims here that are directed to a specific improvement to computer functionality, the patent-ineligible claims at issue in other cases . . . recited generalized steps to be performed on a computer using conventional computer activity.").

The risk of preemption, which the Supreme Court has identified as a marker of an abstract idea, is significant in this case. Claim 1 of the '089 patent reaches any method of requesting and receiving information that uses the short message service protocol—an extremely common method of personal communication that includes, for example, text messaging. Claim 7 likewise covers any method of automatically collecting data and transmitting that data using the short message

service protocol—also a broad claim that would encompass many uses of the known short message service technology. While the limitations of claims 6 and 8 narrow the scope of claims 1 and 7 somewhat by restricting them to transmissions of data that are date and time stamped, date- and time-stamping are sufficiently common practices that the potential preemptive effect of the '089 patent would be broad, raising the types of concerns that the Supreme Court alluded to in *Alice* and *Bilski*.

For the reasons given, the Court concludes that asserted claims of the '089 patent are directed to abstract ideas.

**2. Step Two:  Whether the asserted claims of the '089 patent recite an inventive concept**

Applying step two of the two-step test from *Alice*, the Court must determine what, if any, inventive concepts are described and claimed in the '089 patent.

As noted above, the specification describes two separate embodiments. The first uses the "drop and add packet technique" and is described in columns 4 through 10 of the specification. The second, which is disclosed in columns 11 through 13 of the specification, uses the short message portion of a communications control channel to transmit data between a mobile subscriber (for example, where a utility meter is located) and a remote device, from which data collection instructions are sent and to which the collected data is returned. *See id.*, col. 11, ll. 54–64; col. 12, ll. 12–44. The specification acknowledges that the short message system was designed to compose and interpret short messages consisting of a limited number of characters, and that the invention made no technological changes to the short message system, but merely used that system for transmitting particular data requests and responses to those requests. *See id.*, col. 12, line 61, through col. 13, line 5.

The first embodiment—the "drop and add packet" embodiment—is not recited in the claims of the '089 patent. Instead, the '089 claims are directed solely to the second embodiment. They expressly refer to data packets that are "in a form which conforms to conventional short message data packets," and transmissions of data "via a short message service portion of a control channel of [a] personal communications system transmission protocol." *Id.*, col. 14, ll. 17–18, 19–23. Furthermore, the Abstract of the '089 patent describes the invention of that patent as a "method for transmitting data to and from a data collection device using the short message service functionality of the control channel of a personal communications system transmission protocol is disclosed."

Rather than being covered by the claims of the '089 patent, the "drop and add packet" embodiment is described and claimed in the '955 patent, the parent of the '089 patent. The specification of the '955 patent is nearly identical to the first 10 columns of the '089 patent, and the claims of the '955 patent specifically call for the use of the "drop and add packet" technique, providing for the replacement of the information in the dummy packets with messages that are used to transmit instructions and data between the meter reader and the remote device that collects the meter readings. The short message service embodiment was disclosed and claimed for the first time in the '089 patent.

Although much of FCM's argument is based on the detail set forth in the specification, and in particular in portions of the specification that are not directed to the short message service embodiment, that material has no bearing on the issue of the patentability of claims 6 and 8, for two reasons: First, that portion of the specification is not directed to the short message service claims. Second, it is the claims, not the specification, that must contain the inventive concept

necessary to render the claims patentable.  *See Two Way Media*, 874 F.3d at 1338 ("To save a patent at step two, an inventive concept must be evident in the claims. . . . The main problem that Two-Way Media cannot overcome is that the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept."); *see also ChargePoint*, 920 F.3d at 766 ("[W]hile the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the specification must always yield to the claim language in identifying that focus.").

The functions recited in independent claims 1 and 7 amount to nothing more than conventional communications system components operating according to their ordinary functions.  *See Two-Way Media*, 874 F.3d at 1339.  No limitation in the asserted claims "require[s] a new source or type of information, or new techniques for analyzing it."  *Elec. Power Grp.*, 830 F.3d at 1355.  The '089 specification underscores this point, as it explains that the invention employs conventional short message data packets that "may be made using standard data packet assembly and disassembly techniques."  '089 patent, col. 13, ll. 9–10.  Additionally, the personal communications system transmission protocol, of which the short message service is a part, includes "any wire or wireless transmission system that employs a digital or analog transmission protocol system."  *Id.*, col. 4, ll. 7–9.  And, as noted by FCM, the data collection unit is nothing more than a "server," *see* Dkt. No. 1, at 3, which must have the capability of receiving, interpreting, and composing data, *see* '089 patent, claims 1, 6.

Beyond that, the steps of receiving, interpreting, and composing data "fall squarely within [Federal Circuit] precedent finding generic computer components insufficient to add an inventive concept to an otherwise abstract idea."  *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 614

(citing cases). Therefore, the recitation of such components of a conventional communications system fails to transform the otherwise-abstract processes of requesting, collecting, analyzing, stamping, and transmitting information into a patentable invention. *See Elec. Power Grp.*, 830 F.3d at 1355 (The claims "do not require an arguably inventive set of components or methods . . . . They do not invoke any assertedly inventive programming. Merely requiring the selection and manipulation of information . . . by itself does not transform the otherwise-abstract processes of information collection and analysis.").

As for the added limitations in dependent claims 6 and 8 regarding the date and time stamping of the collected data, FCM argues in its opposition to the motion to dismiss that the date and time stamping rendered the claimed inventions not abstract. *See* Dkt. No. 23, at 14. That argument is addressed above. FCM, however, did not argue in its opposition that the date and time stamping limitations constituted or contributed to an "inventive concept" sufficient to satisfy the second step of the two-step *Alice* test for patentability. *See id.* at 22–24. FCM refers to the time-stamping limitation as bearing on the inventive concept issue in a single sentence in its surreply brief. But not having raised the issue in its opening brief, FCM has waived that argument.

Even if FCM had preserved the argument that stamping the data with the time it was collected constitutes an inventive concept, that argument would fail. The Federal Circuit in *TLI Communications* held that attaching classification data, such as dates and times, to images for the purpose of storing the images in an organized manner was an abstract idea and did not constitute an inventive concept. *See* 823 F.3d at 613–14. Additionally, the court held that the act of providing classification information relating to images (such as the dates and times of the images) and storing

those images "taking into consideration the classification information," was not an inventive concept. *Id.* at 614.

Similarly, the Federal Circuit in *Electric Power Group* held that merely "gathering, sending, and presenting" information, including time-synchronization of information, does not constitute an inventive concept absent some suggestion that the recited function is performed by some nonconventional technology. 830 F.3d at 1355. There is no suggestion in the specification or the claims of the '089 patent that the date and time stamping function is performed by anything other than conventional computer components operating in a conventional manner. *See* '089 patent, col. 13, ll. 26–30 ("[T]he data collection device **101** includes a device for data stamping the collected data. The date/time stamp device **108** is an electronic device that provides a time relationship to the collected data. As the data is received from the meter or devices **100**, the date/time stamp device **108** electronically assigns each data reading with the date/time that the data was collected.").

A case closely analogous to this one is the Federal Circuit's recent decision in *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, No. 2018-1697 (Fed. Cir. July 5, 2019). In that case, the Federal Circuit affirmed a decision dismissing a complaint on grounds of patent ineligibility. The patent in that case was directed to a method of processing data sent from the user of a client computer over a network. One step of the method was embedding an alphanumeric string in an extensible field of a data packet, in which the extensible field was a portion of a normally unused HTTP header field of the data packet. The Federal Circuit rejected the patentee's argument that the limitation satisfied the "inventive concept" step from *Alice*. The court wrote that the specification made it clear that HTTP headers were known and that their use to store information

was conventional in the art. *Id.*, slip op. 18. The court concluded that it was clear that there was "no novelty in this method of storing data." Rather, the limitation "merely instructs the user to store information in a known portion of the conventional header field that is not already holding information." *Id.* Even if the embedding process was novel, the court added, it did not render the claims eligible for patenting. Where a claim's "essential advance" is abstract, the court noted, "a novel method of performing that advance does not avoid the problem of abstractness.'" *Id.*, slip op. 19 (quoting *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253, 1263 (Fed. Cir. 2016)).

That analysis applies directly to this case. Like the process of embedding data in an HTTP header field, the process of transmitting data by the short message service protocol was well known. The asserted inventive concept in *Bridge & Post* was to use the underutilized HTTP header to transmit information about a user, a use to which the HTTP header had purportedly not been put before. Yet the fact that the patent claimed the transmission of a different type of data by a recognized mode of data transmission was not sufficient to constitute an inventive concept. Similarly, the fact that the well-known short message system protocol was being used to transmit a different type of data—in the case of the '089 patent, sending requests for data and returning the collected data—is not enough to constitute an inventive concept.

It is well recognized that the use of conventional information transmission technology that differs from the prior art only in that it is being used to transmit different information is not patentable subject matter. *See Praxair Distribution, Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*, 890 F.3d 1024, 1032 (Fed. Cir. 2018) ("Claim limitations directed to the content of information and lacking a requisite functional relationship [to the medium] are not entitled to patentable weight, because such information is not patent eligible subject matter under 35 U.S.C. § 101."); *see also*

*In re Marco Guldenaar Holding B.V.*, 911 F.3d 1157, 1161 (Fed. Cir. 2018) (same); *In re DiStefano*, 808 F.3d 845, 848–50 (Fed. Cir. 2015) (no patentable weight is given to the particular information transmitted over a substrate or medium; such information is given patentable weight only "if the claimed informational content has a functional or structural relationship to the substrate"). In this case, as in *Bridge & Post*, the communications technology is not new. All that is arguably novel is that different information is being conveyed by the same conventional technology. That is not enough to constitute an "inventive concept" within the meaning of step two of *Alice*.

Relying on the Federal Circuit's decisions in *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018), and *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), FCM argues that the complaint raises factual questions as to whether any claim element or combination of elements would have been routine and conventional in the view of a skilled artisan in the relevant field at the time of the invention. Dkt. No. 23, at 8–9. For the reasons set forth above, the Court concludes that this case does not raise any factual question as to that issue. The claims of the '089 patent recite functional limitations that are tied to the short message service portion of the control channel of a personal communications system. The invention simply entails a conventional use of the short message service to transmit particular information. As the '089 specification makes clear, the personal communications systems used in the invention were well known and the use of the short message service portion of the control channels of those telecommunications systems was also well known. All that is purportedly novel is the contents of the short message system messages. And, as noted above, the use of a conventional communication protocol to transmit information is not patentable simply because the subject

matter of the information is new. Moreover, as discussed, time-stamping computer generated records is well-known, so the addition of a limitation directed to time stamping data as of the time of its collection is not sufficient to raise a factual question as to whether the subject matter of the claims is well-recognized, routine, and conventional.

In this case, FCM's general position with respect to the "inventive concept" step of the *Alice/Mayo* inquiry is that the combination of elements recited in each of the asserted claims amounts to an inventive concept. That is, the assertedly "inventive concept" is the abstract idea itself. As noted, however, the "inventive concept" element of the section 101 analysis requires "significantly more" than the abstract idea itself. FCM asserts that the factual issues with respect to claims 6 and 8 of the '089 patent are whether the limitations of each of those claims would be well-understood, routine, or conventional to a skilled artisan. But that is merely asking whether the claim as a whole is the inventive concept. Because FCM has not suggested that there is a factual issue as to whether the asserted claims are directed to something significantly more than the abstract idea itself, FCM has failed to point to a discrete factual issue on which the presence of an "inventive concept" in claims 6 and 8 would turn.

The *Berkheimer* and *Aatrix* cases do not stand for the proposition that a plaintiff can avoid dismissal simply by reciting in the complaint that the invention at issue is novel and that the inventive concept resides in the abstract idea itself. As Judge Moore explained in her opinion concurring in the orders denying rehearing en banc in the *Aatrix* and *Berkheimer* cases, 890 F.3d 1354, 1359 (Fed. Cir. 2018), and 890 F.3d 1369, 1374 (Fed. Cir. 2018), it is "clear from *Mayo* that the 'inventive concept' cannot be the abstract idea itself, and *Berkheimer* and *Aatrix* leave

untouched the numerous cases from this court which have held claims ineligible because the only alleged 'inventive concept' is the abstract idea."

District courts have frequently decided section 101 issues on motions to dismiss, and the Federal Circuit has approved of that procedure on numerous occasions, including in cases post-dating the decisions in *Aatrix* and *Berkheimer*. *See, e.g., Bridge & Post*, *supra*; *SAP Am., Inc.*, 898 F.3d at 1166 (citing cases); *Berkheimer*, 881 F.3d at 1368 ("Patent eligibility has in many cases been resolved on motions to dismiss or summary judgment. Nothing in this decision should be viewed as casting doubt on the propriety of those cases."); *see also Univ. of Fla. v. Gen. Elec. Co.*, 916 F.3d 1363, 1369 (Fed. Cir. 2019); *Voit Techs., LLC v. Del-Ton, Inc.*, 757 F. App'x 1000 (Fed. Cir. 2019); *Glasswall Sols. Ltd. v. Clearswift Ltd.*, 754 F. App'x 996 (Fed. Cir. 2018); *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1011–13 (Fed. Cir. 2018); *Interval Licensing*, *supra*; *Burnett v. Panasonic Corp.*, 741 F. App'x 777 (Fed. Cir. 2018); *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376 (Fed. Cir. 2018); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced.") (citing cases).

Finally, FCM argues that claims 6 and 8 of the '089 patent should be deemed to be directed to an inventive concept because those claims survived a prior attack in an inter partes review proceeding. In that proceeding, IPR2017-09132, the Patent Trial and Appeal Board ("PTAB") held that claims 6 and 8 (unlike the other claims of the '089 patent) would not have been obvious, because no prior art reference that was before the Board disclosed the use of time and date stamping with the technology recited in the patent. In FCM's view, the Board's ruling on the issue

of obviousness "confirm[s]" that the claims "are neither routine nor conventional." Dkt. No. 23, at 9.

That argument is unpersuasive. The fact that the PTAB found that claims 6 and 8 were not invalid for obviousness does not resolve the issue of patent eligibility. It is well established that patent eligibility within the meaning of section 101 of the Patent Act and novelty within the meaning of sections 102, 103, and 112 of the Patent Act are discrete issues. *See Diamond v. Diehr*, 450 U.S. 175, 190 (1981) ("[W]hether a particular invention is novel is 'wholly apart from whether the invention falls into a category of statutory subject matter.'") (quoting *In re Bergy*, 596 F.2d 952, 961 (C.C.P.A. 1979)); *Two-Way Media*, 874 F.3d at 1339–40 ("Eligibility and novelty are separate inquiries."). In particular, the fact that the PTAB concluded that the use of time and date stamps in this particular setting would not have been obvious does not answer the question whether the claims are directed to an inventive concept within the meaning of the second step of the patent-eligibility test in *Alice*. Applying the standards used to assess patent eligibility under section 101, the Court concludes that the date and time stamp limitations do not constitute an inventive concept sufficient to overcome UPS's section 101 motion.

The Court therefore holds that the '089 patent claims are directed to abstract ideas and that they do not recite an inventive concept. The motion to dismiss based on patent ineligibility under 35 U.S.C. § 101, Dkt. No. 19, is granted.

IT IS SO ORDERED.

SIGNED this 22d day of July, 2019.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE